We call the next case, please. Counsel, when you're ready, would counsel presenting argument please approach, introduce yourselves, spell your last name for the record. If you need a second, that's fine, too. My name is Miriam Seerig, my last name is spelled S-I-E-R-I-G, and I'm here from the State Appellate Defender's Office on behalf of Earl Harris. Assistant State's Attorney Annette Collins for the people of the State of Illinois. Good morning, Ms. Collins. So we typically give 15 minutes per side. We try to be a little flexible with that. We've got a bit of a docket today, but we can give a little bit. Ms. Seerig, is that how you pronounce it? Seerig. Seerig, okay. Would you like a few minutes for rebuttal, I assume? Yes, if I could reserve two minutes. Sure, that's fine, whatever you need. Okay. You have the floor, Ms. Seerig. May it please the Court? This Court should remand the instant case to the trial court to give Mr. Harris an opportunity to make a record and show that his crime was not one that reflects permanent incorrigibility, but rather permanent transient immaturity. Three reasons. First, procedurally, Mr. Harris is in the form that the Supreme Court has suggested in Harris by filing a post-conviction petition. Second, as a matter of Illinois law, Miller protections apply to Earl Harris's discretionary life sentence. And third, as pertaining to the facts in this case, in his petition, Mr. Harris has alleged sufficient facts to demonstrate that as applied to him, a natural life sentence is unconstitutional. When you say that, according to Illinois law, that the fact that this was discretionary has really no impact one way or the other, hasn't the Supreme Court only said that, though, in cases involving juveniles? It has, but when we take together Holman and Harris, which I think really are the two cases that speak to this issue, then I think the only conclusion is that a discretionary life sentence like in Holman would also entitle Mr. Harris to the same relief. Essentially, I think when we think about how the Illinois Supreme Court has incorporated Miller protections, the question is, at a hearing, there would be a determination for a young adult like Mr. Harris whether his brain is like the juvenile brain. And once we make that determination, once the judge makes that determination, whatever the determination is, but if the judge makes the determination that Mr. Harris's brain was more like a juvenile than an adult, then the Miller protections The state is challenging you by saying that in your petition, you don't really have any evidence or you haven't pled any facts about the difference between the development of a brain of a 20-year-old, say, and that of a 16-year-old. Well, that is something that would be developed at a hearing, at an evidentiary hearing or at a sentencing hearing, depending on what the relief ultimately is. But why shouldn't that be already in the petition? That's what the state is sort of challenging you on. Well, we are at a very early stage. Mr. Harris is in prison. He has pled what he has. And there is actually a lot. And the Post-Conviction Hearing Act allows us to look at everything that is in the record, which includes his PSI and includes most probably most importantly his sentencing hearing. And this is, you know, if by filing a post-conviction petition, even a successive one, the trial court has the ability to look at all of that. And really that's all at this early stage that's really needed to say we cannot, as a matter of law, say that there isn't sufficient facts in this petition because we know that he was young. We know that, you know, by pleading Miller, I think he has shown that the brain science applies. And by pleading House, he has shown that the brain science applies even to him as an 18 to, say, 21-year-old. So I think there is enough here to, between the record, between the law that he has cited, to say he's stated enough of a claim to allow him to at least proceed to an evidentiary hearing and to get counsel appointed who can then say, well, an expert could probably fill out this claim more. But for, I think, the pleading standard that we have at this early stage, I think he has shown everything that he needs to show. So... Counsel, what about the age of the defendant? I mean, where do we – how would we do this? How would we articulate the reasoning for this? I mean, he wasn't a juvenile, so you're saying he has the brain of a juvenile, possibly. You want a chance to make that case. But where do we stop? Do we stop at 21? Well, I think that there's – first of all, you only have to do this on an as-applied, case-by-case basis. So you don't have to draw a line. But I think Illinois has shown in several instances that the line is probably not drawn at 18, but that – and has recognized that the line probably is a little further out. Well, hasn't the Supreme Court probably drawn that line, though? Do you think that they've suggested anything different? Or was Thompson maybe that door that opened? I think between Thompson and Harris, the Supreme Court has opened the door for these types of claims. Thompson was 19, wasn't he? Thompson was 19, and Harris was 19 as well, I believe. I'd have to look. But they were both over 18. Well, this defendant is 20, right? He's 20. And if we go outside of Illinois – well, first of all, if we go with the brain science, the brain science really says that into the mid-20s, the brain is developing, and especially is developing in those parts of the brain that control the kinds of things that we're interested in, impulsiveness. Well, that the brain is developing, does that suggest that just because the brain is continuing to develop, and it will continue to develop in different ways throughout life, does that necessarily mean that someone who is 20 years of age does not have the capacity to know the difference or, you know, to be less impulsive? I guess I'm with Justice Ellis. Where are we going to draw this line, and how? Well, first of all, I, unfortunately, I'm not a neurobiologist or a brain scientist, so I think that really speaks to the need to have an expert speak about the – tell us what the brain science is and how it would apply to somebody like Mr. Harris or to Mr. Harris in this specific case. And, frankly, how a hearing like that would look, I think, is still kind of out there as a question. I could certainly see that an expert would be called and said – Are you just basing this on a number, the chronological age of the defendant? I mean, because what would be the difference if he were, say, 21? I think at the age of 21 that same analysis would apply. I think ultimately somebody will likely draw the line, and I think other countries have drawn the line. There are good reasons, I think, in our society to draw the line at 21 because we have alcohol laws, we have – Well, the legislature has recently drawn a line with 21, hasn't it, in reinstating parole for murder offenses committed, not all murders, but certain murders? Correct. That is one of the new changes to the law. So if Mr. Harris was convicted of this crime today, he would actually have that opportunity after 20 years, which – Well, I don't think this would be one of those cases. I think it's actually limited to what we would call a straight-up murder, not one with an aggravated – With an aggravated – But my only point was that the legislature has now focused upon the age of 21 for that purpose, which is an indication of certainly a change in the way we're looking at or we will look at sentences for offenders that are under 21 that have committed murders without an aggravating factor. So there is this notion that there is kind of a line that may be able to be drawn. That's the only reason I mentioned it. Right. No, and I think that's correct, and I just want to say in addition that the line, wherever it's drawn, I think includes Mr. Harris at this point because he is in that sort of 18 to 21-year-old bucket where I believe the Illinois Supreme Court suggests there is an as-applied question that gives the defendant the entitlement to show how this brain science applies to his case in particular. And I think there are parts of this case that really speak to the impulsiveness and to the brain science that we know and that connect his particular record with what is actually in the case law. This was actually planned and thought out. They knew these youngsters or young persons knew why they were entering into this particular facility. They planned to rob, so how does that quantify impulses? Well, I think there are several factors that sort of bring this into the ambit of youthful behavior. One, it wasn't Mr. Harris's idea. This was the idea of a 34-year-old who said, let's go rob this place, which goes to the Miller factor of pressure, outside pressure that young people are more prone to give way to. Then at the moment, there's the rash decision-making. There's the bar owner who suddenly appears in his underwear and calls police, and the shots fall. So it's that type of not future-oriented risk-taking. Isn't that, though, I mean, just a typical scenario for any criminal conduct? So you can have 35-year-olds who walk into a place and all of a sudden there is what will be the victim appears, and in order to complete the act, they act rashly or irrationally and they kill someone? I think ultimately what this brings us back to is the need for somebody with some knowledge of brain science to actually make these connections and tell us whether this falls under an underdeveloped brain or whether this is just an adult brain functioning as an adult would. I think really that is fact-finding that a trial court would do, that at the appellate court level, without a more developed record, is really not right for decision at this point. But the result of that is, to take your argument to its conclusion, we have a fair number of people in this state who are incarcerated for murders. They were committed when they were in their early 20s, probably, unfortunately. They got life sentences, discretionary life sentences. And every one of them could have this argument. And every one of them would be sitting there saying, I don't know what the line is, but I'm on the right side of that line. Give me a hearing, too, just like you gave Harris in that case. I don't think every single case has that argument because we know from Holman that there are sentencing hearings that have occurred where a trial judge has actually made a sufficient inquiry and where the trial judge has really said, this person falls into that incorrigible bucket that the Supreme Court has designated as the person that is the worst of the worst. And Holman was one of those. There were, I think, eight murders in the background, and the judge made the inquiry into his age, and he was actually 17. And the court said, discretionary, mandatory doesn't really matter. This was a fair finding. So it's not everybody, and I don't know what the numbers are, but, again, the question is what happened at Earl Harris's sentencing hearing, and as applied to Earl Harris, should he have the opportunity to fill out this record? And all the judge said in this particular case was, you were young. And I want to say that the fact that you were 20, I believe he said, and that was almost like, well, you're 20. You should have already known better. Like it was almost held against him in a way that we would not do today. Was there anything else in the record that we would presume that the trial judge considered prior to imposing sentence? What else was in the record? Even if there was not live testimony, what else was in the record? Well, there wasn't a ton of things in the record. There were things that the state brought out. Well, didn't you kind of minimize that? I thought there was extensive testimony from police officers regarding a number of offenses he committed as a juvenile. His mother testified. That was in the record as well, wasn't it? And he had a few offenses as an adult before this, didn't he? Well, he was only 20. Right. But I'm just saying, back then it was 17. I was 17. And between 17 and 20, I think he had a few. He had a ‑‑ I don't want to minimize this record. Okay. I don't want to minimize this record, but I do want to find out that the inquiry that happened about him and about the life that he had and the impulsiveness and the state of his development is not in the record and was not looked at. And I think maybe the one more point to make is this was a death penalty hearing. The judge did consider a life sentence versus a death sentence. And that was really like the majority of the ‑‑ and when you read the mother's pleas, she does not say, and please give him ‑‑ she just says, please spare his life. Don't execute him. So we kind of know that that was the center of that hearing. So did he ‑‑ In a sense, it was a victory. Yes. Today it wouldn't have been. Today it would be the worst sentence you could get. Correct. But back then, no. So if there are no further questions, I reserve the rest for Rebecca. Thank you so much. Of course. Good morning. Again, Your Honors, Assistant State's Attorney Annette Collins on behalf of the people of the State of Illinois. I'm going to split up my responses to confine my argument to both the Eighth Amendment first and then proportionate penalties. Before I'm going to get into that, however, I want to point out some serious foundational analytical flaws in the defendant's argument. The defendant says that he's in the right forum and says that because of that, he should be given a chance because Miller applies to adult discretionary sentences. None of those are correct as a matter of law. Now, he may be in the right forum, but being in the forum isn't enough. Under our Post-Conviction Hearing Act, to withstand the natural rejection of a successive petition, the defendant must show prima facie proof of cause and prejudice. We haven't heard anything about how he's done that. What he's asked for is a chance, but there's nothing in his pleading that would establish either cause or the necessary prejudice, not even a prima facie showing of that, in order to entitle him to the relief he seeks. Well, isn't he arguing that in this successive post-conviction, he's banking on the House decision to sort of prop him up and get him through the door? Yes, he is. But if we take a look at his petition, his petition, actually the language in his petition is that this is mandatory life. He cites the Miller decision. He talks about the lack of discretion. He talks about sort of the lack of any statutory consideration of age or mitigation or attendant circumstances. Well, this – I don't think that now, at this point, counsel's really suggesting it's a mandatory life. I mean, it's not. No. It is not. It was discretionary. It was. And it wasn't just discretionary after a rejection of death. Once the judge determined that he was death-eligible but he wasn't going to impose death on the defendant, the judge was not forced to sentence him to life as the only alternative. The judge had the entire range of 20 to 60 and could have sentenced him to life in this case because of the presence, and it isn't disputed, the presence of an aggravating factor. I want to ask you something about a couple of cases that the state has entered into agreed motions. Correct. For summary remand. Mm-hmm. All right. You've done it in Williams, Cordell. You've done it in Brian Willis. Now, those two were mandatory life sentences, right? Yes. And they were both double murders, right? Yes.  accountable? I think only one of them was accountable. Okay. So I have to ask you, Ms. Collins, are you drawing the line here? Oh, and also importantly, one is 19 and one was 18. And we tried to do an agreed motion in-house, too. But that was denied in the decision. Yes. Agreed. Okay. But in this case, you've agreed, and they are mandatory. But, again, double murder, and you're agreeing to send it back for second stage. Now, I'll explain why. All right. Sending it back to second stage is the natural course we'd leave to file a success petition as granted, because it's higher than the gist burden, so we wouldn't be necessarily sending it back to first stage. So that, in and of itself, is of no moment. The reason that we've agreed to summary remand in that case is precisely because of the Harris and Thompson decisions. Both of those cases, and it brings me back to the third fundamental flaw in defendant's argument. Defendants said today that Miller applies to adult discretionary sentences. Thompson and Harris never actually held that Miller applies to adults under either the Eighth Amendment or the proportionate penalties. They just, those decisions just said that these defendants are not foreclosed from bringing their claims. So, since a defendant is not foreclosed from bringing a claim, as a matter of law, under the proportionate penalties clause, if he can allege that the lower court was divested of any discretion to consider mitigation, he should be given the opportunity to allege that he is in, and, again, we're extrapolating from the decision what he has to prove and allege. But it seems that the Supreme Court is suggesting that adult defendants can't just point to their age. There is no presumption that the brain science is going to apply to somebody who is 18, 19, 20. But going back to my question, then, I'm just trying to get a clarification from you. Are you then saying that in Williams and Willis, you've agreed to the second stage proceedings? And since this isn't a mandatory life case, you wouldn't agree to it here? And the reason we can't agree to it here, because no U.S. Supreme Court and no Illinois Supreme Court has suggested that an adult receiving a discretionary life sentence is in any way shocking to the moral conscience. Now, going back to House, so is your only suggestion here that because the decision that I authored did not allow for, didn't send it back for second stage, which had already occurred, at least I thought it had, that that was really the only thing that was holding that up? Okay. So one of the reasons that we asked to send it back, again, for another second stage proceeding in House, was up until that point, we hadn't had the benefit of Harris, and we hadn't really fully fleshed out from the Illinois Supreme Court what was expected of adult defendants in order to Didn't Thompson suggest the very thing that was done in House, that being that a 19-year-old could have an as-applied challenge under a mandatory life sentence? Didn't they say that, and they said the correct forum would be in a post-conviction proceeding? And they said one more thing. So then why is House still sitting there if you have the benefit of Harris now? Okay. Because neither Harris Hang on. I'm here. I know. I'm here. I want to know. Neither Thompson nor Harris was ever given the opportunity to plead a claim under Thompson and Harris. It was the pleading stage that we were concerned about. Because when we go to a hearing, the pleading stage is over. We know what is the defendant's allegations. We know how to marshal a defense against that. We need that pleading stage. And the pleading stage is crucial when adults are concerned because there isn't that presumption that the brain science is going to apply to that. Is there any pleading? Tell me if I'm wrong. Is there any pleading in Williams or Willis that ever pled that in their particular case that brain science indicated that they may not have the opportunity? Not with respect to those individual circumstances. Because when we take a look at Harris in particular, Thompson is a little bit, glosses over it a little bit more. Harris gives us a little bit more in-depth view of what the Supreme Court may expect. Again, we're all looking through a crystal ball here a little bit because all that the Supreme Court said in Harris and Thompson was the defendants are not necessarily foreclosed. Neither said there is such a claim. Neither said that these two defendants can show it. But what Harris said is, number one, we are not going to allow age alone to be the defining characteristic. The Supreme Court 100% rejected that. They said it does not apply with equal force, that presumption that Miller provides for juveniles. Harris also explained that because this is an as-applied challenge, these adult defendants would be expected to show how their own individual circumstances establish that Miller principles would apply to them. Now, taking that language, that leads me to believe that what the Supreme Court is suggesting is that an adult has to plead and then later plead for proof to get relief that their maturity, their physical characteristics, their home life, whatever it may be that has put them in the same classification as individuals who are juveniles and thus presumed to suffer from the same cognitive impulse control, all of the attendant issues that Miller and the scientific research has disclosed. And that is one of the reasons why we are suggesting that the court below rightly denied leave to file in this case, because this petition that we got from the defendant only alleges that he's 20, he should be given the benefit of this ruling in Miller because of his young age, the brain science applies to him with equal force, and therefore, he should be given, quote-unquote, the opportunity to try to marshal some expert testimony. But so if this were a mandatory life sentence, would you be agreeing to a second stage? Not necessarily. But in these other two cases, there were no allegations in those petitions that that particular individual had any deficiency. So I'm not sure I'm getting what is your answer. I have to say not necessarily because we look at every case individually. Okay. And we should look at this one individually, shouldn't we? Absolutely. Absolutely. And I think that we have an alternative argument, too. Assuming that you believe that we can take from Harris and freight it with all of the juvenile law that's come out post-Miller, including Buffer, including Holman, which, again, we dispute as a matter of law that Harris went that far. But even assuming if it did, this defendant's discretionary sentence here, given what we know that was before the circuit court, there is nothing in this record, nothing in the lengthy sentencing hearing that occurred, to indicate that this defendant suffers from any cognitive or maturity deficits whatsoever. And I'm going to use the House defendant as the illustrative example because accepting that the House decision was correct, that defendant was the least culpable of any criminal defendant. He was a lookout. He was part of a gang that was undergoing an internecine gang war. And he was scooped up very quickly to be a lookout. And he also had significant mitigation in his background with respect to his parents and the way he was raised. And I believe he was raised by his grandmother and his mother may have been a drug addict. And there was a significant amount of mitigation that would at least indicate that there were some significant deficits in both his upbringing and his maturity level and his culpability in the crime. So looking at that case, it stands in stark contrast to what we have here. We have a 20-year-old defendant. He'd been employed in the past. He passed the 11th grade. He had a good relationship with his mother and siblings. He didn't get along with his father because his father was too strict, but his father was helping support him. And rather than being an impulsive act, this defendant, since the age of 14, had been committing robberies, strong-arm robberies, aggravated batteries. Now, a lot of these cases were juvenile cases, but they showed a grave violence. And the Court recognized that from a young age. And the Court also recognized that this defendant's violence didn't stop as he matured. It got worse, culminating in this crime. And further... Yeah, well, there was an instance during one robbery where he... Right, but one of the crimes he... Yeah, he beat another child with a metal bar in his head. Well, was that one of his juvenile offenses? Yes, it was. That was a juvenile offense. Do you think there's any difference, though, between a... In this case, I mean, the evidence does show that it was a 34-year-old man who rounded up this person, his girlfriend, and another kid, and go in, and we're going to rob this place? It was the girlfriend who was 34, so defendant's theory is he was... His girlfriend was 34? Yeah, Patricia Bass, I think. I don't think so. I think that the defendant that's getting out in two years was 34. Maybe I'm wrong. Patricia Bass got a 30-year sentence. Right, she's out. She's out. The other one's out. No. The next one's getting out in two years from now. Okay. He may have been 34. I believe the girlfriend was the older individual, and I think that's the argument that the defendant is making. I could be wrong, and maybe we can clear that up in rebuttal, but my understanding is that defendant was... Defendant is alleging that he was kind of being led by his girlfriend, and I think the record shows otherwise. Is there anything incompatible about, you know, like the double murder people who have to get life versus... And this is not diminishing the life that was taken in this case, but there was one life taken in this case. Is there any incompatibility here with these other people that are over 18, they're going back, they're getting second stage, they were found guilty of two murders, and then this person who's... You know, everybody else is getting out. They're all going to be out of prison, and then this 20-year-old will die in prison, and you're saying he's one of the ones that is just totally incorrigible and should never, ever see the light of day again. That is, of course, the alternative argument I'm making. The first argument is there's no legal support for the proposition that an adult receiving a discretionary life sentence is in any way offensive to our proportionate penalties clause or for the Eighth Amendment for that matter. So that's our initial argument. As a matter of law, he cannot show cause because there is no case, not from our Illinois Supreme Court, that actually says that you're an adult, but you get to claim the same protections as a juvenile, even though you have a discretionary life sentence, and the court likely, and in this case proven to be so, considered your age. So any line that's drawn is going to create those divisions, Justice McBride. We understand that. Yeah, I know, there have to be lines. I understand that. I think the legislature, though, is clearly moving away from the line of simply a juvenile. I don't disagree. And I think Harris gives us at least some indication that the court is not shutting it down completely. Is there any inclusivity in the idea of going into a tavern and, you know, everything going haywire, and then going back and getting $30? Do you think there's a day that that kid doesn't think about how stupid this whole thing was? Not to mention the horror and the loss of life. I'm not even talking about that, but the sheer stupidity and recklessness of divvying up $30 later. It is vile and offensive that these crimes occur. It does not mean, however, that defendant is less culpable simply because the victim came out in his underwear and yelled police. And we have to also take a look at the evidence here, because what we're doing is we're snapshotting this with this loss that somehow defendant is impulsive and he's a youth because he's 20. What we also have to look at is that what defendant said to his friend after this crime, that he shot the victim because the victim was trying to get away, going to alert the police. Was that the person, though, that had, like, two or three armed droppers facing himself? And then as soon as he came to the police station, he had information about this case. Well, he had information about this case because he was a friend of defendant's and defendant told him what happened. If he happened in the face of his own... Absolutely, yes, but that doesn't mean we're not going to believe him, particularly where what defendant told him is consistent with the physical evidence, because when we take a look at the autopsy results in this case, Wojtek Rutkowski died from a gunshot to the back of his shoulder that traveled into his heart, and he also had another gunshot in his side. So that is not somebody who's being shot in the front. That's somebody who's being shot as they're turning, which is consistent with what defendant told Willie Anderson. Now, remember, defendant also told the police that he wasn't the shooter, but that was just him trying to mitigate the crime for himself. Every piece of evidence here shows that he was the shooter, and before he was the shooter, he was holding a gun to the bartender's head so Patricia Bass could get money. And before he committed this crime, he carried a .38 caliber gun, and of course the victim was killed with .38 caliber bullets. So this is not a defendant who, like Antonio House, the illustrative example, who was just scooped off the street to be a lookout. This is somebody who is ready, willing, and able to take part in an armed robbery of a tavern, to use a gun that he's known to carry, and to actually put it to somebody's head and then shoot somebody else to stop them from getting police. And to dispute the defense perception that defendant is easily led, defendant also told Willie Anderson that don't worry about this shooting. It's all going to be fine. Don't worry about it as long as they don't catch the bitch. Defendant was referring to Patricia Bass, his cohort, who was taking the money out of the till while defendant held the bartender at gunpoint. So if anything, this record, and I believe that this post-conviction court was well aware of this as well, this record shows nothing in support of this defendant being like a juvenile. It shows nothing about this defendant being less culpable or in any way having mitigating circumstances that would call into question the constitutional validity of the life sentence. And for these reasons, and those in our brief, we would ask that this court affirm the denial of leave to file. Thank you counsel. Just a few things on rebuttal. First the factual question. So Michael Boyd, the 34-year-old ringleader, received a 65-year-old sentence and he's the one to be released. Patricia Bass was, actually I was looking for her age, I don't know that we know her age. She was a girlfriend, she got a 30-year sentence, so did the Michael, Mr. Walton, whatever his last name was, who also received a 30-year sentence. So that's just in comparison to the life sentence that Mr. Harris received. I don't think we can relitigate who did what here, and that's really not what the question is. I think what the state is generally trying to say here is they want to take the actual relief that the Illinois Supreme Court is starting to offer and take the oomph out of it. They say the judge had the discretion to give him a term of years. But that's what Holman, that's really what Holman says. It's about meaningful consideration, not mere discretion. That really goes to the heart of the Holman decision. Did he have discretion, but did he use that discretion? I think we have the sentencing hearing that says he didn't. And then the same with... Would we ever be saying there was an abuse of discretion if he was 30, based on the sentencing hearing that's in this record? Would we ever say that that trial judge abused his discretion under the facts that are in the record right now? I don't think we would. Because this is a discretion that takes into account the young brain. And I think at 30 there's no scientist that has said at 30 this is a young brain. Aren't there some cases, though, that even someone younger than 20, even a 16-year-old, might have a brain that is far more developed than even a 30-year-old? I'm just responding to your argument, because you're just, again, relying on a chronological number and presuming or concluding that based on that number we must conclude that the brain is underdeveloped. And I don't know that there is an absolute to that, given what we know. There are geniuses, even, who are 12 and 13. I think I'm going with a number that society has agreed on. And there are other societies that say, in Germany, where juvenile sentencing goes up until 21. And, in fact, they go with that particular discretionary period between 18 and 21, where they say we can either use juvenile sentencing or adult sentencing, dependent on the defendant that we have in front of us. So I think there is a lot of support for, are there outliers somewhere? I'm sure there are, but is there a general agreement that there is development, and the science will back this up, that the brain develops until about the mid-20s? Yes, and should our sentencing be in line with that? I think that's what Miller says. I agree with both points. I do want to just maybe finish off with the fact that I think the absurd result in the distinction between discretionary and mandatory life sentences is that if there had been two victims here dead, then we would probably allow Mr. Harris to make a claim in the trial court. Thank you, Ms. Collins, for an excellent oral argument today and very good briefs. It's a difficult case.